UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
PLAINS MARKETING, L.P.,

                          Plaintiff,        **REPORT AND**
                                             **RECOMMENDATION**

- against -

                                            10 CV 2032 (KAM)

DONIPHAN ENERGY, LLC,
d/b/a HOMETOWN ENERGY,

                          Defendant.
----------------------------------------------------------X

       On May 5, 2010, plaintiff Plains Marketing, L.P. ("Plains Marketing") commenced this action against Doniphan Energy, LLC, d/b/a Hometown Energy ("Doniphan"), seeking to recover amounts due and owing in connection with nineteen agreements in which plaintiff agreed to sell propane to the defendant. In its Amended Complaint, filed on September 3, 2010, plaintiff has alleged claims for breach of contract and for account stated. Currently pending before this Court on a referral from the district court is plaintiff's motion for default judgment.

## FACTUAL BACKGROUND

       According to the Amended Complaint, Plains Marketing is a limited partnership, organized under the laws of the State of Texas, duly licensed to conduct business in New York. (Am. Compl.[1] ¶ 1). Defendant Doniphan is a limited liability company, organized under the laws of Missouri, with its principal place of business at 3080 Highway 62-412, Hardy, Arkansas. (Id. ¶ 4).

---

[1] Citations to "Am. Compl." refer to the plaintiff's Amended Complaint, filed on September 3, 2010.

Plaintiff alleges that between April 2, 2008 and August 1, 2009, Plains Marketing entered into nineteen separate written agreements with defendant, in which plaintiff agreed to sell propane to defendant. (Id. ¶ 5). The agreements provided that they would be governed by the laws of the State of New York, and the parties "irrevocably and unconditionally consented to the exclusive jurisdiction of this Court." (Id. ¶ 6). According to the Amended Complaint, the agreements provided that defendant would pay carrying charges for the inventory and would pay counsel fees in the event of a lawsuit. (Id. ¶ 7, 8).

Plaintiff alleges that between October 13, 2009 and January 27, 2010, pursuant to the written agreements and at the request of the defendant, plaintiff sold and delivered propane to defendant, which defendant accepted at an agreed-upon price, with a total value of $267,255.34. (Id. ¶ 9). After giving defendant credit for payments made, plaintiff seeks $246,569.40 under its First Claim for Goods Sold and Delivered. (Id. ¶ 10). In its Second Claim for Account Stated, plaintiff alleges that it rendered full and true monthly accounts of the indebtedness owed by defendant, which were accepted without objection by defendant, resulting in an account stated claim of $246,569.40. (Id. ¶ 11).

Plaintiff's Third and Fourth Claims sound in contract. Specifically, in its Third Claim for Breach of Contract, plaintiff alleges that between April 2, 2008 and August 1, 2009, it purchased inventory to fulfill the terms and conditions of its agreements with the defendant. (Id. ¶ 12). Plaintiff incurred carrying charges for the inventory in the amount of $149,071.56, and seeks reimbursement from defendant under the terms of the agreements. (Id. ¶¶ 13, 14). Plaintiff's final claim alleges that although plaintiff purchased inventory to fulfill its agreements with defendant, defendant defaulted under the agreement, refusing to take delivery and refusing to

2

cure its defaults despite written notice from the plaintiff. (Id. ¶¶ 16-19). Following defendant's defaults, plaintiff sold the inventory that it had purchased to fulfill its contracts with the defendant in accordance with the agreements, suffering a loss of $409,799.55. (Id. ¶ 20). Plaintiff seeks to recover the amounts owed in accordance with the agreements.[2] (Id. ¶¶ 10, 14, 21, 22).

## PROCEDURAL HISTORY

On November 16, 2010, this Court held an initial conference in the case at which time the parties indicated that they were close to settlement. Accordingly, the Court gave defendant until December 17, 2010 to file its Amended Answer to the Amended Complaint if the parties failed to reach a settlement before that time. On December 17, 2010, defendant Doniphan filed an Amended Answer to the Amended Complaint and the Court subsequently held a telephone conference with the parties on January 19, 2011. The parties indicated that they were still attempting to negotiate a settlement so the Court adjourned the conference until March 16, 2011. Following the March 16, 2011 conference, the parties appeared for a telephone conference on April 1, 2011, at which time it became clear that settlement discussions had stalled. Accordingly, the Court set a discovery schedule and ordered the parties to appear on June 21, 2011 for a status conference.

On April 20, 2011, defendant's counsel filed a motion to withdraw, alleging that he had

---

[2] While plaintiff's Complaint sets forth a request for attorney's fees (see Am. Compl. ¶¶ 10, 14), plaintiff does not include attorney's fees in its calculation of damages. Accordingly, the Court respectfully recommends that the district court make no award of attorney's fees at this time.

3

made numerous attempts to contact a representative from the defendant corporation but with no success. The Court scheduled a hearing on the motion for May 31, 2011 and Ordered a representative from defendant Doniphan to appear for the hearing. Neither defendant or its counsel appeared for the May 31, 2011 hearing, so the Court adjourned the hearing until June 17, 2011. At that time, defendant Doniphan again failed to appear, so the Court granted counsel's request to withdraw and gave defendant 30 days to find new counsel, warning that if new counsel did not appear, a default would enter. A written Order memorializing that warning was issued on June 22, 2011 and mailed to defendant Doniphan. The Order specifically warned:

> Defendant is hereby informed that a corporation, such as the defendant, may not appear in federal court without counsel. The Court therefore gives defendant 30 days, from the date of this Order, to find new counsel. If counsel fails to file a Notice of Appearance in this case on behalf of the corporate defendant on or before July 25, 2011, the Court will recommend that a default enter against the defendant.

(6/22/11 Order).

On August 30, 2011, plaintiff Plains Marketing moved for a default judgment based on defendant's continued failure to obtain counsel or participate in the litigation. The motion for default judgment was thereafter referred to the undersigned, who issued a Report and Recommendation dated September 22, 2011, recommending that a default enter against the defendant and the case proceed to an inquest on damages if the defendant failed to contact the Court within fourteen (14) days of the Report and Recommendation, indicating an intent to defend in this action. (9/22/11 R&R). On October 19, 2011, when defendant still had not contacted the court, the district judge issued an Order adopting the Report and Recommendation

4

and referring the matter for an inquest.

This Court thereafter issued an Inquest Order, requiring the parties to submit papers in connection with the damage calculations by November 21, 2011 and to appear for an inquest hearing on December 7, 2011. Although plaintiff filed papers in connection with the inquest, defendant Doniphan did not submit any documentation and failed to appear for the inquest hearing held on December 7, 2011.

## DISCUSSION

### I. Default Judgment

#### A. Legal Standard

Rule 55(a) of the Federal Rules of Civil Procedure provides that "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules and that fact is made to appear by affidavit or otherwise, the clerk shall enter the party's default." Fed. R. Civ. 55(a). Rule 55 sets forth a two-step process for an entry of default judgment. See Enron Oil Corp. v. Diakuhara, 10 F.3d 90, 95-96 (2d Cir. 1993). First, the Clerk of Court enters the default pursuant to Rule 55(a) by notation of the party's default on the Clerk's record of the case. See id. Second, after the Clerk of Court enters default against a party, if that party fails to appear or otherwise move to set aside the default pursuant to Rule 55(c), the court may enter default judgment. See Fed. R. Civ. P. 55(b).

In determining whether to enter a default judgment, the Second Circuit has cautioned that since a default judgment is an extreme remedy, it should only be entered as a last resort. See Meehan v. Snow, 652 F.2d 274, 277 (2d Cir. 1981). While the Second Circuit has recognized

5

the "push on a trial court to dispose of cases that, in disregard of the rules, are not processed expeditiously [and]. . .delay and clog its calendar," it has held that the district court must balance that interest with its responsibility to "[afford] litigants a reasonable chance to be heard." Enron Oil Corp. v. Diakuhara, 10 F.3d at 95-96. Thus, in light of the "oft-stated preference for resolving disputes on the merits," default judgments are "generally disfavored" and doubts should be resolved in favor of the defaulting party. Id. Accordingly, plaintiff is not entitled to a default judgment as a matter of right simply because a party is in default. See Erwin DeMarino Trucking Co. v. Jackson, 838 F. Supp. 160, 162 (S.D.N.Y. 1993) (noting that courts must "supervise default judgments with extreme care to avoid miscarriages of justice").

The Court has significant discretion to consider a number of factors in deciding whether to grant a default judgment, including (1) whether the grounds for default are clearly established; (2) whether the claims were pleaded in the Complaint thereby placing the defendant on notice, see Fed. R. Civ. P. 54(c) (stating "[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings"); King v. STL Consulting LLC, No. 05 CV 2719, 2006 WL 3335115, at *4-5 (E.D.N.Y. Oct. 3, 2006) (holding that Rule 54(c) is not violated in awarding damages that accrued during the pendency of a litigation, so long as the complaint put the defendant on notice that the plaintiff may seek such damages); and (3) the amount of money potentially involved – the more money involved, the less justification for entering the default judgment. Hirsch v. Innovation Int'l, Inc., No. 91 CV 4130, 1992 WL 316143, at *2 (S.D.N.Y. Oct. 19, 1992). Additionally, the Court may consider whether material issues of fact remain, whether the facts alleged in the complaint state a valid cause of action, whether plaintiff has been substantially prejudiced by the delay involved, and whether the default judgment might have a

harsh effect on the defendant. See Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 62 (2d Cir. 1981).

B. Plaintiff's Claims

In this case, plaintiff alleges that defendant breached nineteen separate agreements, pursuant to which plaintiff purchased agreed-upon quantities of propane on behalf of defendant and defendant agreed to pay for and take possession of the propane.

1. Breach of Contract Claim

Turning first to plaintiff's breach of contract claim, it is well-established under New York law[3] that a party alleging an action for breach of contract must prove the following: "(1) a contract; (2) performance; (3) breach by the other party; and (4) damages." First Investors Corp. v. Liberty Mut. Ins. Co., 152 F.3d 162, 168 (2d Cir. 1998) (internal citations omitted).

Here, with respect to the first element – the existence of a contract – the Court finds that plaintiff has established that the parties entered into a series of contracts in which it was agreed that plaintiff would purchase and then supply to Doniphan quantities of propane at an agreed-upon price. In connection with the inquest proceeding, plaintiff presented a copy of the Plains Marketing Canada, L.P. Terms and Conditions which governed each of the nineteen written agreements entered into between plaintiff and defendant as of January 1, 2009. (Kaplan Aff.,[4]

---

[3] This Court analyzes the claims under New York law. Both parties' briefs rely on New York law and no contrary choice of law argument has been raised.

[4] Citations to "Kaplan Aff." refer to the Affidavit in Support of Damage Award of Steven A. Kaplan, Esq., dated November 21, 2011.

7

Ex. A (Terms & Conditions)). Plaintiff also provided copies of the Sales Contracts for product that was ordered but not accepted for delivery, and the Sales Invoices for product that was delivered and accepted but not paid for. (Id., Exs. B, C). Based on a review of the submitted documentation, including the Sales Contracts which set forth the price per gallon, as well as carrying and storage charges, and the Terms and Conditions governing the relationship between the parties, the Court finds that plaintiff has established that an agreement existed between the parties as set forth in the documentation provided by plaintiff.

Turning to the second and third elements of the breach of contract claim, the Court finds that Plains Marketing performed its obligations under the agreement between the parties in that it arranged for the purchase and storage of propane pursuant to Doniphan's orders. There is no dispute that Doniphan failed to pay for this propane as required under the agreements, causing a loss to the plaintiff. Thus, the Court finds that plaintiff has stated a claim for breach of contract and that the evidence supports plaintiff's claim that the parties agreed to the terms as alleged.

2. Account Stated Claim

Plaintiff also alleges a claim for an account stated. "An account stated occurs when a debtor and a creditor come to a mutual agreement as to how much the debtor owes the creditor," Johnson and Johnson Fin. Corp. v. BSR Realty L.P., No. CV-96-0567, 1996 WL 546284, at *4 (E.D.N.Y. Sept. 19, 1996), and even without a formal contract, this mutual agreement is enforceable. See id. In order to establish an account stated, plaintiff must prove that Doniphan manifested an express or implied "'promise [as] a debtor to pay a stated sum of money which the parties had agreed upon as the amount due.'" David R. Maltz & Co., Inc. v. Wachovia Bank,

8

N.A., No. 07-CV-1049, 2010 WL 1286308, at *11 (E.D.N.Y. March 31, 2010) (quoting White Diamond Co., Ltd. v. Castco, Inc., 436 F. Supp. 2d 615, 623 (S.D.N.Y. 2006)); see also Kramer, Levin, Nessen, Kamin & Frankel v. Aronoff, 638 F. Supp. 714, 719 (S.D.N.Y. 1986). This promise "'must be founded upon previous transactions'" between the parties "'creating the relationship of debtor and creditor.'" David R. Maltz & Co., Inc. v. Wachovia Bank, N.A., 2010 WL 1286308, at *11; see also Nuera Commc'ns., Inc. v. Telron Commc'ns. USA, Inc., No. 00 CV 9167, 2002 WL 31778796, at *3 (S.D.N.Y. Nov. 15, 2002). The parties must agree as to the accuracy of the balance due, Harold R. Clune Inc. v. Healthco Medical Supply, 78 A.D.2d 914, 914, 433 N.Y.S.2d 52, 53 (3rd Dep't 1980), and "[t]here can be no account stated where any dispute about the account is shown to have existed." Candelarie v. Scientific Innovations, Inc., No. 08 CV 1714, 2009 WL 2824727, at *4 (E.D.N.Y. Aug. 28, 2009) (internal quotation omitted).

Given the testimony presented at the inquest hearing and the supporting documentation, the Court finds that plaintiff has established its claim for an account stated by a preponderance of the evidence and is therefore entitled to damages. However, an account stated claim "is distinct from one for breach of contract, and cannot be utilized simply as another means to attempt to collect under a disputed contract." David R. Maltz & Co., Inc. v. Wachovia Bank, N.A., 2010 WL 1286308, at *11 (internal citations omitted). In contrast to breach of contract actions, account stated claims are quasi-contractual causes of action based on theories of unjust enrichment. See generally, David R. Maltz & Co., Inc. v. Wachovia Bank, N.A., 2010 WL 1286308, at *11-12; Guandong Enterprises (North America) Fur Holdings Ltd. v. Hennessy, No. 01 CV 0620, 2002 WL 1000953, at *17 (S.D.N.Y. May 15, 2002). These claims properly arise

in situations where there is an underlying express agreement between the parties giving rise to liability but no formal contract between them. See David R. Maltz & Co., Inc. v. Wachovia Bank, N.A., 2010 WL 1286308, at *11. Consequently, "[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." Xuchang Rihetai Human Hair Goods Co., Ltd. v. Hanyu Int'l USA Inc., No. 00 CV 5585, 2001 WL 883646, at *5 (S.D.N.Y. Aug. 7, 2001) (citing cases).

Accordingly, given that the Court finds that plaintiff has stated a valid breach of contract claim, the Court need not address damages under the Account Stated claim.

## II. Damages

### A. Legal Standard

Unlike allegations pertaining to liability, allegations in connection with damages are not deemed admitted in the context of a default judgment. The burden is on the plaintiff to establish its entitlement to recovery. See Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992). Defendants who default are entitled to discovery regarding unliquidated damages. See Securities & Exch. Comm'n v. Wang, No. 88 CV 4461, 1989 WL 135558, at *1 (S.D.N.Y. May 22, 1989); Clague v. Bednarski, 105 F.R.D. 552 (E.D.N.Y. 1985). When a court enters a default judgment and the amount of damages sought does not consist of a sum certain, Rule 55(b) of the Federal Rules of Civil Procedure provides that:

> [t]he court may conduct hearings. . .when, to enter or effectuate a judgment, it needs to:
> (A) conduct an accounting;

10

>    (B) determine the amount of damages;
>    (C) establish the truth of any allegation by evidence; or
>    (D) investigate any other matter.

Fed. R. Civ. P. 55(b)(2). While "the court must ensure that there is a basis for the damages specified in a default judgment, it may, but need not, make the determination through a hearing." Fustok v. Conticommodity Servs., Inc., 122 F.R.D. 151, 156 (S.D.N.Y. 1988) (collecting cases), aff'd, 873 F. 2d 38 (2d Cir. 1989).

### B. Monetary Damages

In this case, plaintiff filed reasonably detailed materials pertaining to the damages incurred and presented the testimony of a witness at the inquest hearing. Defendant failed to make an appearance or otherwise present evidence on the issues of damages. Accordingly, the Court considers the plaintiff's evidence and recommends that damages be awarded as follows.

#### 1. The Inquest Hearing

At the inquest hearing held on December 7, 2011, plaintiff presented the testimony of Jerald Davison, a marketing representative for Plains Marketing. (Tr.[5] at 2). As the witness made clear during the course of his testimony, Plains Marketing is seeking damages for three different categories of losses: (1) losses due to amounts of propane that Doniphan took, but never paid for; (2) losses due to amounts that Doniphan ordered but never accepted; and (3) storage and

---

[5] Citations to "Tr. at" refer to pages in the transcript of proceedings held before this Court on December 7, 2011.

11

carrying charges. (Id. at 10, 12-13, 26).

According to Mr. Davison, Plains Marketing provides a service to its customers where it purchases large amounts of propane on a wholesale basis and then re-sells it to smaller dealers such as defendant Doniphan. (Id. at 6). Plains Marketing maintains a book and an inventory of product and "flow[s] through a lot of volume through this business." (Id.) According to Mr. Davison, Plains Marketing entered into a contract with Mr. Littles at Doniphan to purchase propane for the coming season in advance. (Id.) This "precontract" or contract then locks in a price for Doniphan. (Id. at 6-7). According to Mr. Davison, Plains Marketing maintains a warehouse of inventory, where they physically store the propane underground and then it is flowed through a pipeline and customers such as Doniphan would then send their own trucks to pick up the propane. (Id. at 7).

Mr. Davison testified that Plains Marketing does not speculate in the market; rather, it sells the propane at a very low margin, with a one to two percent markup. (Id.) At the time the parties entered into these nineteen contracts to purchase quantities of propane in 2008, the prices of propane were "very high." (Id.) When the financial crisis occurred, prices collapsed and, although Plains Marketing tried to work with Doniphan, Mr. Littles informed plaintiff that he was having difficulty making payments at the time. (Id.) Although plaintiff carried the product for two years, at which point the price was substantially lower, Doniphan never picked up any of the product. (Id.) At that point, Plains Marketing had to buy the propane back from Doniphan at a lower market price to mitigate the losses. (Id. at 8). Essentially, on or about February 12, 2010, Littles agreed to sell the product that Plains Marketing had been holding for him back to

the open market, agreeing to reimburse Plains Marketing for the loss. (Id.) During this period, Mr. Littles had numerous conversations with Plains Marketing, failed make payments, and promised to sign a personal guarantee, which he never signed, all the while the market price continued to fall. (Id. at 23). When Doniphan agreed to the buy-back of propane that had been ordered but never received, Plains Marketing priced the propane as of that day, and resold it on the market to someone else at a lower price. (Id. at 19).

The Plains Marketing Canada, L.P. Terms and Conditions provide that: "[u]nless otherwise provided, Buyer shall be responsible for all switching, freight, demurrage, special handling, storage, detention, and additional charges associated with each tank car." (Kaplan Aff., Ex. A at 2.7.1). With respect to the storage costs, Mr. Davison explained that Plains Marketing leases storage space from storage operators who charge plaintiff an annual fee, which is then passed on to Plains Marketing's customers. (Tr. at 26). It is common industry practice that as of the beginning of the season, which is usually March 1 or April 1, if the customer has not lifted the propane, the seller has the right to bill the customer for the cost of holding it in storage until the next season. (Id. at 26-27). Since plaintiff paid the storage costs for the two years that it held the propane for Doniphan, without charging Doniphan for the costs, and because the contract provides that plaintiff may bill for these costs, plaintiff is now seeking reimbursement for the costs of storage. (Id. at 27-28). Mr. Davison explained that in trying to work with Doniphan, Plains Marketing did not charge defendant for the storage costs during the period that it was holding the propane even though it was charging the people who actually were paying their bills on time. (Id. at 28-29).

There is also a "carry fee" that is a charge that covers plaintiff's cost of money for holding the propane in the lines. (Id. at 29). This carry fee is to "keep us whole in our cost of interest, which we're paying." (Id. at 30). Again, according to the witness, this is common practice in the industry and is spelled out in the contracts. (Id.; see Kaplan Aff., Ex. A at 2.7.1)

### 2. Propane Received But Not Paid For

According to plaintiff, the last payment that defendant made to plaintiff for product was on January 27, 2010. (Kaplan Aff. ¶ 4). On April 1, 2010, the plaintiff's Director of Financial Services, Mike McBride, contacted Mike Bilbrey of Doniphan to demand payment, sending a promissory note to that effect in an attempt to resolve the matter. (Id.) When the promissory note was not signed and no further payments were made, counsel for plaintiff spoke to Mr. Bilbrey on April 21, 2010 in an effort to resolve the disputes. (Id.) A formal demand letter and notice of termination was sent on April 27, 2010 by plaintiff's outside counsel, but no further payments were made. (Id., Ex. E). Thereafter, suit was commenced on May 5, 2010.

The total amount due for propane that was delivered and accepted by Doniphan is set forth in the Sales Invoices attached as Exhibit B to the Kaplan Affidavit. These invoices, when totaled add up to $267,255.34. However, as explained by the Kaplan Affidavit, defendant made a partial payment that was credited to these invoices, resulting in a total amount of damages of $246,569.40 owed as a result of defendant's failure to pay for product which it accepted.[6] (Kaplan Aff. ¶ 7, Ex. B).

---

[6]Based on the calculations set forth in plaintiff's Exhibit B, it appears that defendant made a payment of $20,685.94 on Invoice No. S107827.

14

Having reviewed the plaintiff's submissions and taking into account the amounts paid, the Court respectfully recommends that plaintiff be awarded $246,569.40 in damages for propane delivered but not paid for.

### 3. Market Losses on Propane Ordered But Never Accepted

As Mr. Davison explained, defendant's failure to perform under the contract by refusing to accept delivery of propane ordered forced plaintiff to mitigate its damages by selling the refused propane at market price, which was significantly lower than the agreed-upon contract price. (Tr. at 7-8; Kaplan Aff. ¶ 8, Ex. C). Specifically, plaintiff claims that it had purchased 940,659 gallons of propane pursuant to defendant's order, which defendant ultimately refused to pick up. (Kaplan Aff. ¶ 8). The propane, which was purchased pursuant to fixed price contracts with defendant, had to be resold at market price, which by then had dropped dramatically. (Id.) Plaintiff calculated its losses by adding the price per gallon to the buyback price per gallon for each contract, and then subtracted that total from the contract price. (Id. ¶ 9). The resulting number was then multiplied by the number of gallons involved. (Id.)

In connection with this claimed loss, plaintiff has submitted the original sales contracts and buy back contracts showing the difference in price between the contract price and the market price at which the propane was eventually sold. (Id. ¶ 9, Ex. C). The invoices showing market loss are also provided as Exhibit D to the Kaplan Affidavit. (Kaplan Aff., Ex. D).

Based on a review of the documentation presented by plaintiff, the amount due and owing for product which plaintiff was required to sell at market price is $409,799.55. Accordingly, having reviewed plaintiff's submissions, the Court respectfully recommends that plaintiff be

15

awarded $409,799.55 in damages based on the defendant's failure to receive the propane ordered which plaintiff was then required to sell at a lower market price.

### 4. Storage and Carrying Charges

The final amount sought by plaintiff as damages for defendant's breach is $123,201.54 in storage and carrying charges. (Kaplan Aff. ¶ 10). These are charges, as explained by Mr. Davison, that are provided for in the contracts and that are assessed whenever product is held past the agreed-upon delivery date. (Tr. at 26-30; Kaplan Aff. ¶ 10). The storage fees are set annually by the operators of the storage facilities and are a pass-through cost which represents the actual cost that plaintiff incurred in storing the product. (Id.) Plaintiff submitted a spreadsheet showing the storage calculations by invoice, entitled "Gridsheet by Customer." (Id., Ex. F). Included with Exhibit F are the calculations showing "carrying charges," which is an amount assessed on a monthly basis for holding product in the lines. (Tr. at 29; Kaplan Aff. ¶ 10, Ex. F). These calculations are achieved by multiplying the rates charged by the number of remaining gallons of product. (Kaplan Aff. ¶ 10).

Based on a review of plaintiff's submissions, it appears that the storage charges amount to $58,591.60, with the carrying charges totaling $64,609.94. (Kaplan Aff., Ex. F). Together, these charges amount to damages in the amount of $123,201.54. (Id.)

Accordingly, having reviewed the plaintiff's submissions, the Court respectfully recommends that plaintiff be awarded $123,201.54 in damages for storage and carrying charges

for the propane never received.[7]

### 5. Interest

In addition to the damages set forth above, which total $779,570.49, plaintiff seeks statutory interest calculated from the date of defendant's last payment – January 27, 2010. Using 9% per annum as provided for by New York State Law, the Court respectfully recommends that plaintiff be awarded statutory interest in the amount of $146,146.08 from January 27, 2010 to the date of this Report and Recommendation.

## CONCLUSION

In summary, the Court respectfully recommends that a default judgment enter against defendant Doniphan Energy LLC, and that plaintiff be awarded a total of $925,716.57 in damages, representing: (1) $246,569.40 for product received but not paid for; (2) $409,799.55 for product that was sold at market price; (3) $123,201.54 in storage and carrying charges; and (4) interest in the amount of $146,146.08.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within fourteen (14) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's order.

---

[7] The Court notes that plaintiff's Amended Complaint sets forth $149,071.56 in carrying charges and does not explicitly mention storage fees. (See Am. Compl. ¶ 14). Plaintiff now requests $123,201.54 in storage and carrying fees. In light of the fact that the amount plaintiff now seeks is lower than that requested in the Complaint and because the Terms and Conditions of plaintiff's agreement specifically provided for imposition of these fees, the Court finds that the amount requested for storage and carrying charges is reasonable. (Kaplan Aff. ¶ 10).

17

See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 72(b); Small v. Sec'y of Health and Human Servs., 892 F.2d 15, 16 (2d Cir. 1989).

The Clerk is directed to send copies of this Report and Recommendation to the parties either electronically through the Electronic Case Filing (ECF) system or by mail.

**SO ORDERED.**

Dated: Brooklyn, New York
February 28, 2012

\S\ CHERYL
Cheryl L. Pollak
United States Magistrate Judge
Eastern District of New York